The first case on calendar is New York v. Mountain Tobacco. So we shall hear you now. Good morning. Good morning, Your Honor. May it please the Court, Nelson Boxer and Deborah Frankl from Petrillo Klein & Boxer for King Mountain. The state's brief is loaded with hyperbole and exaggeration about cigarette trafficking, terrorist organizations, and the ills of smoking. And this case is nothing to do about any of that. If it was about the ills of smoking, in 2013, the state would not have abandoned its application for a preliminary injunction. In 2016, it wouldn't abandon its motion for an interlocutory appeal. And if it was about the ills of smoking, it would be prosecuting all of King Mountain's customers at Indian reservations within the state of New York. It's done none of those things. It seems to be about tax money. Exactly. Exactly. And so, hyperbole aside, my client is an Indian-owned, 100%, Indian-located, located almost 3,000 miles away from where we sit today, that employs approximately 50 Indians and kept detailed records and invoices, which form essentially the state's case, and did not sell to consumers. And that's the critical fact. With respect to the geography of New York, it only sold to Indian-owned businesses or to Indians. And we're not saying that the tax scheme is unconstitutional. We're not saying anything has to be struck down. We're just saying that the two federal statutes, taking their plain language, does not apply to King Mountain's sales. And so, starting with the PACT Act, the sales from the Yakima Reservation, which is situated within the geography of Washington State, and King Mountain's customers, which were on reservations sitting within New York, were not interstate commerce under the PACT Act. District Court ruled in your favor on that? Yes, it did. I'm just asking a question. Yeah. Yeah. Well, it's true. We're the appellant and the cross-appellee. I'll tell you. If you'd like me to just focus on... No, not at all. In fact, I find this interesting. I was thinking about this question. I take it that they're shipped by truck from one reservation to the other, reservation or reservations, correct? In almost all instances, correct. Yeah. And the question is, is that interstate commerce because it's between reservations, right? Correct. Because I was thinking of flying, as I hoped to do before too long, between Seattle and Anchorage, okay? Okay. And the question for me was, is that interstate? Am I flying interstate? Excuse me, is that a foreign flight? After all, I'll be flying from one American city to another American city, but I'm going to be flying it through Canadian airspace. Interesting question. It seems not to be. I'm going from one American city to another. But supposing I went by truck and I went from Seattle through British Columbia up to wherever the Alaskan highway is and I used that method. Would that not be interstate, I mean, excuse me, international travel? It would be international travel, but it wouldn't be interstate commerce under the PACT Act because it defines the delivery where the cigarettes are delivered as the end point of the commerce. So it doesn't account for the route that it traverses between the starting point and the end point. So it's not as used in conversation. It's as specifically defined by statute. Precisely, as delivered. I would just say one more thing about the PACT Act. What I think makes it all make sense, because the state says none of it makes sense, is that two things. Number one, it defines state and Indian country separately. And so it would make no sense for state to include Indian country if that were the case. And Indian country doesn't appear in the definition of state. And second, the PACT Act is focused on remote sales. That's why it was enacted. And that's a sale where the buyer and seller are not together. And the concern expressed was, for example, an Internet sale and losing control over the regulation of such a sale. And when you think about that purpose, there's nothing missed in the regulatory scheme by King Mountain Sales from its reservation to a New York reservation because it's the next leg of the transaction. It's the sale to the consumer that is still captured by the PACT Act. And I think that's why one of the examples of interstate commerce was from a reservation in New York to a place in New York outside the reservation. And I think that's the second formulation. And that's designed to prevent- You could turn to the New York tax law. Okay, I will. Which you won in part and lost in part. Correct. Now, you won in part on the theory that you were not in possession of the cigarettes because they were on board a common carrier. But didn't you have constructive possession? After all, you could have called a common carrier and said, no, no, no, no, no. I know we said to send it to point A. Send it to point B. You could have exercised dominion over it. Well, I think the record made clear that once it left King Mountain's warehouse in the Yakima Nation, it no longer had possession of it. It's a legal matter. The state never tried to prove otherwise. So that's not an issue? I'm unaware of it being an issue. There was no discovery or examination about whether there was constructive possession, delivery free on board, free on delivery. None of that was in the case. I think it was accepted that once it left Yakima, it was no longer in King Mountain's possession. Your client concedes that it did not sell the cigarettes to a licensed stamping agent. That's correct. And you lost on that. We did. Sounds like that's right. Correct? Well, we take issue with one of the court's precedents in Oneida, Cuomo v. Oneida, that held that the only point of entry in New York is through a New York stamping agent. If you look at the regulation that's cited for that proposition, it actually doesn't say that. And I think the precedent has developed that there are so many regulations surrounding the use of a stamping agent that necessarily that must be the only way for a point of entry into New York. But that regulation in Section 74 of Title 20 of the New York regulations actually does not require that. And so I appreciate the court said that. I think it said it in dicta. But we take issue with that dicta. Yeah, it's true. It may have been dicta, but that's the basis of liability that's imposed on you, is it? Yeah. It's the basis of the injunction. Because on liability, I think it was conceded that the excise stamp. Isn't that the whole ballgame? Because if you're subject to the injunction, you're not going to be doing any more shipping of the cigarettes into the nation. And that's the end. It is the whole ballgame now. When we started, there were some other challenges. But you're absolutely right. And I say a couple of things about that. First, I think under the principles of res judicata, there were only two transactions that were included in this claim, a December 3, 2012 seizure and a November 6, 2012 purchase. And as I'm sure the court's aware, there was a parallel administrative tax case brought by New York with respect to the seizure. It was eventually dismissed with prejudice in King Mountain's favor, zero taxes owed. And I think- Was it adjudicated or settled? It wasn't a settlement. It was a voluntary dismissal with prejudice. It was not adjudicated. The state presented a stipulation of dismissal with prejudice, taxes zero. There was no hearing. There was no evidence. And the district court took the view that the transaction a month before was not part of the same series of transactions such that it would be subject to claim preclusion. Well, I'm not sure that's exactly what it held. I mean, it didn't say it's not part of the same series of transactions. Obviously, it was part of the same series of transactions, but it was just a different transaction. And it really doesn't mean then that you don't have to pay taxes if taxes are owed on that transaction. Correct. And I think on taxes owed, we won on both transactions. My point is that for the injunction to only sell to stamping agents, that derives from that same claim, the third claim. It derives from it, but the administrative body didn't have the power to impose an injunction. They could not impose the full measure of relief that the state is seeking now. That's true. That's true. The state also didn't seek anything other than the collection of taxes in its complaint and in its amended complaint on that claim. So we were, in a sense, surprised to see that at the very end of the litigation when we got to the remedy stage. You may have seen it at the very end of the complaint, because it's seeking, well, I guess all complaints seek all appropriate relief. To that extent, it may have said that. Didn't it occur to you that appropriate relief might include an injunction? They had only been speaking to a collection of taxes owed from us by reason of our possession. And in many ways, the federal statutes were important, but that was the big exposure for the client right up until the end. Because you do the math on their excise taxes and the invoices we gave them, it was quite a lot of taxes. And so you're right that the Department of Tax and Finance could not impose an injunction, even if it was a litigated proceeding. But it was brought up as a tax claim under Article 20. It was charged in the complaint as a possession of tax, Article 20. And certainly the November purchase was part of the same transaction in the way claim preclusion is examined, that it should have been subject to res judicata. That's our opinion on that. With, may I address briefly the CCTA? I appreciate we're a respondent, but- No, I- I reserve two minutes, I just- It makes sense to argue the thing is one ball of wax. Okay, I appreciate that. Indian and Indian country. As I said, King Mountain is 100% owned by an Indian. It's organized under the laws of the Yakama Nation. You must be a Yakama. It's a former corporation, an Indian corporation there. It's situated within the Yakama Nation. And the term Indian is undefined in the statute. But Indian Nation is. Indian Nation is. And there's no- You're in an Indian Nation. Your client is in an Indian Nation and makes the cigarettes there. Correct. And so we're not relying on the phrase Indian Nation. It's not an Indian Nation. It's not asking for tribal sovereign immunity. The state has thrown that out quite a bit, especially in the district court. And every time it's been raised, we've said, that's not our issue. We're not contesting. We're subject to sovereign immunity. But what Judge Seibert did, relying on Hobby Lobby, looked to the Dictionary Act where a person is deemed to include a corporation. And since Indian was undefined, why wouldn't and why shouldn't Indian also include an Indian corporation? And that particularly makes sense in this statute because contraband cigarettes, as defined under the statute, is 10,000 or more cigarettes. The statute, which has both criminal and civil aspects to it, was focusing on cigarette traffickers and bootleggers. And so the formulation the state proposes is that only an individual who has more than 10,000 cigarettes, a million cigarettes, whatever it is, is subject to civil action by the state. Is there any precedent on this, any law on this? I haven't seen any precedent. I'm asking because I'm not aware of any. I'm not aware of any either. There's a D.C. Circuit case that dealt with the record-keeping requirements of the PACT Act that cited Judge Seibert's decision but essentially distinguished why its case was not related on the issues to our case. It didn't comment on our case. It just reported it. So I'm unaware of any precedent. And the one precedent I would point to the court is a New York City case we cited, Wolfpack Tobacco, which was the city of New York pursuing bootleggers and traffickers of unstamped cigarettes throughout the city. It charged, I believe, six or seven companies. One was an Indian-owned corporation. There was Indians that were charged. There were non-Indians charged. And for its CCTA cause of action, it did not charge the Indian-owned corporation. And I think, to me, that is a powerful inference that it appreciated that Indian and Indian country under the CCTA applied to an Indian-owned corporation. Lastly, I would just say on the CCTA, this is all about what the state can do. These restrictions do not apply to federal enforcement. It's a carve-out for civil enforcement only by states and localities like New York City. And so I think it further makes sense that the federal government, who is principally responsible for Indian oversight and Indian issues, would circumscribe and limit what the state could do by Indian and Indian country. And I think interpreting it to also include an Indian corporation is consistent with that goal. Okay, you've reserved a couple minutes rebuttal, and we'll hear you then. I appreciate the indulgence on the opposition to the appeal. Thank you. By all means. May it please the court- You can lower that. Yeah, I am giving it a shot. There we go. There you go. May it please the court, Judith Vail for the State of New York. May I reserve two minutes of rebuttal on the cross appeal? Yes. Thank you. I'm going to just touch very briefly three points on the New York State claims, and then move to the cross appeal on the federal claims. First, under the New York claims, the regulation at issue does state expressly that dealers cannot or are prohibited from selling un-stamped cigarettes in New York. And the statutes 471 and 471-E say the same thing expressly, as this court made clear in Oneida Nation. Second, on the Res Judicata point, there were many other undisputed sales of un-stamped cigarettes that came after December 2012. Those were in the complaint. The complaint said ongoing sales, which were indeed ongoing. It looks like there's one. There's the November 2012, which was before December 2012. And then there were many other undisputed sales that were proven through discovery. You can see these- Are they charged in the complaint? The complaint says ongoing sales, and the injunctive relief here contemplated that the sales had continued well past December 2012. And when it comes to Res Judicata, whether you look at the November 2012 or the ones after, Res Judicata does not remotely bar those. ATF would have no way of raising any claims about any of those other sales in a tax proceeding. That's like saying if you win on your tax claim for your 2017 income taxes, you could use that to preclude claims about your 2016 taxes or your 2019 taxes. That just doesn't make any sense. And finally, the last thing I'll say, unless the court has questions on the state claims, is that the tax money is about public health. New York's high taxes are designed to depress the sale and use of cigarettes, which is a major public health problem. And the tax money itself actually goes to public health in cigarettes as well. Does that matter here? Only in terms of the injunction was based on the irreparable harm, which included the immense public health harm to the state from the massive, massive sale of un-stamped cigarettes into New York by King Mountain. I'll now turn to the federal claims and start with the PACT Act. The plain language of the PACT Act does include King Mountain sales. The first prong says interstate commerce includes cigarettes that go from outside a place in a state into the state. And that's exactly what happened here. It went from outside New York, the Yocamba Reservation in Washington, into New York. And that first prong, by its plain terms, is classic interstate commerce. It doesn't say anything about Indian country. It doesn't matter for that first prong whether the shipment started or ended or both in Indian country. What matters is that it crosses a state line. And that is clear from the plain terms of the definition. It's also clear from the other statutory definitions of state and Indian country. The reason why Congress defined those two terms separately is because of the second and third prongs of the statute, which expand the meaning of interstate commerce into nontraditional intrastate movements that involve Indian country. And in order to make sense of those nontraditional meanings, you have to know what Indian country is in order to know when a cigarette moves within New York but touches Indian country. But Indian country is separately defined. It is separately defined. And it's not a state. I mean, Indian country obviously is not a state. Well, that's true, but that doesn't mean that it's not within the state in which it is located, which remains the case. Both under the plain terms of the statute, when Congress defined state, it simply said states are the 50 states of the U.S. and other large geographical areas like D.C. and Puerto Rico. But when you say 50 states, you include what's in the 50 states. You include New York City is in New York. A reservation that's in New York is in New York. A lake that's in New York is still in New York. Congress doesn't list out everything that's in a state when it defines states to include things like D.C. and Puerto Rico. But in the definition, it says that it's interstate commerce if it goes from a place within a state to a place within the same state but through Indian country. That's right. That carves out Indian country as a different place. It carves that out only to expand the meaning of interstate commerce into purely intrastate commerce. And if you look at the second and third prongs, they contemplate that the Indian reservation is located in the state that is geographically located. And it says that expressly. But you need to define Indian country in order to make sense of these nontraditional interstate commerce definitions. And it really doesn't make sense to say that in expanding interstate commerce to these nontraditional areas, Congress would have meant to also detract from the classic plain vanilla meaning of interstate commerce. And another... If you look at the definition and the text we're talking about, we're talking about commerce between points in the same state but through any place outside the state or through Indian country. You're talking about points. And if that point is in Indian country, then the point is not in a state. It's in Indian country. And it's going to another point. And that point is also in Indian country. So it looks like that subdivision there is talking about point to point rather than the area of the transit route, which is what you're talking about. Well, I agree that it's talking about points. But I don't agree that that means that something cannot be both Indian country and within New York at the same time. The definitions don't remotely suggest that. And if you look at the reporting requirement, the reporting requirement specifically contemplates, and this is at 15 U.S.C. 376, specifically contemplates that when cigarettes land on a reservation in New York, they go to both the reservation and New York. And reports under the PACT Act have to be filed in both the state and the tribal government if that tribal government also imposes its own taxes. And in fact, the reporting requirement is structured so that it says only when a state gets the PACT Act report, then you also have to give the reports to a relevant local government or Indian tribe. So it's the same idea if cigarettes land in New York City. They land in both New York City and the state of New York. And PACT Act reporting is required both to the city, which has its own tax, and the state. It's the same concept for Indian country. And it wouldn't make sense to have reports to both if Indian country was outside of the state. And again, the reason why Indian country and state are, they are separately defined, but it's to operationalize those nontraditional prongs of interstate commerce. They do not affect the first prong of interstate commerce, which doesn't even mention Indian country at all. Unless the court has other questions on the interstate commerce, I'm happy to turn to the PCTA. The Indian and Indian country language is not meant to be so broad. It is meant to preserve the preexisting protections that existed, not just for tribal sovereign immunity, which is one part of the statute, but also for tribal sovereignty. Tribal immunity also extended and creates protections for individual tribal members on their own land. That is a background, a longstanding background principle of federal law. And that's what Congress was trying to preserve with this phrase. It was not trying to expand and create new protections for corporations that are not members of a tribe by the rules of the accommodation and that leave that reservation, cross the country, and come into another state. That's an area where states have traditionally had power to tax and impose other regulations. And this comes not just from the background principles, but from the language itself of the statute. Congress uses the term Indian without a definition. That commonly means a member of a tribe, an individual member of a tribe. And here, King Mountain is indisputably not a member of a tribe. The accommodation actually defines Indian to mean individual. Yeah, but the judge was looking at Indian as a word that works the same as person, which would include corporations, include partnerships, would include foundations, include lots of things. Well, the word person in some statutes or if it's undefined in the Dictionary Act does have that broad meaning, but that's because Congress has given it that broad meaning in the Dictionary Act. That's what individual has 10,000 cigarettes. Well, that actually does happen in this case. Individual that was moving cigarettes for King Mountain had more than 10,000 cigarettes in the truck. But so what Congress wanted to do here was to make sure that when it acted, it was not monkeying with the preexisting rules. And the preexisting rules do give Indian nations much more authority over individual Indians acting in their own tribal land. That is an area where Indian sovereignty and authority is at its highest point, and state authority is at its lowest point. And that's a longstanding principle that has existed in the case law for a long time. But when a company that's not an Indian leaves a reservation, crosses the country and is trafficking illegally in cigarettes in another state, that's an area where traditionally states have had a very high authority. The individual person who could possess the 10,000 or 20,000 cigarettes would be the truck driver? Yes. Yes. And you think that's what this statute is aimed at? That's one of the things that it's aimed at. I think it's aimed more broadly at preserving the background protections and balance that existed at the time. Because the truck driver is acting for the manufacturer, obviously, and is transporting and doesn't really possess them at all, I would think, within the sense of this. And if you're talking about an individual Indian with 10,000 cigarettes, I mean, that's quite an addiction. Well, I don't think the idea is that the individual is necessarily consuming all of the cigarettes, but it is the case that individuals move the cigarettes for companies or own the companies that are moving the cigarettes. But I think the broader principle here is that Congress wanted to preserve the preexisting balance between Indian and state sovereignty. And that balance has traditionally been on individual Indians who are in their own Indian's land. That is an area that is reserved more for Indian authority rather than state. But only unless Congress says otherwise. That's why it was important for Congress to put in this language. Because by acting through a statute, Congress can change the background principles and could authorize a state to come in and bring enforcement actions against an individual in his own Indian country. But that would be upsetting the preexisting rules. And that's what Congress wanted to make sure it was not seen as doing. But there's nothing in the CCTA's history or language to suggest that it wanted to give a massive exemption to corporations that leave the reservation and traffic in illegal cigarettes in another state. We'll hear you on rebuttal. Thank you. We'll hear the United States. Good morning and welcome. Court may have pleased the court. Courtney Dixon for the United States. We're a very welcoming court, but what are you doing here? I mean, no, seriously. Were you ordered to come? I'm talking about the partial government closure. Certainly, Your Honor. I'm curious because we're having a lot of cases in which this issue arises in my mind. Well, we move to adjourn the argument, which we understand is an extraordinary request. The court denied that, and so if oral argument is going forward, obviously this case is of extreme importance for the United States. That's why we're here. The district court's interpretation of the PACT Act creates a substantial loophole in a statute that was intended to close loopholes and to strengthen reporting requirements. But it doesn't involve the safety of human life or the protection of property. Maybe that doesn't apply. I'm sorry. Please ignore. I certainly hope I don't have to address the Anti-Deficiency Act this morning, Your Honor. Don't worry. Don't worry. We aren't going to tell Congress. Okay. Thank you. Yes. In terms of the PACT Act and interstate commerce, I would set those questions aside for Congress. Why don't we reset your time? We started out discussing what you had to say. This didn't come up in my moot court. I'm sorry. Your Honor, the Supreme Court stated in Nevada v. Hicks that ordinarily an Indian reservation is part of the state in which it is located. Congress meant to adhere to that ordinary understanding in the PACT Act in the interstate commerce definition, stated that it includes transactions between a state and a place outside the state. And as we explained in our brief, numerous textual provisions of the PACT Act itself reinforce that Congress meant to adhere to that ordinary understanding. It speaks to Indian territory within the state. Your Honor referred to the separate definition of Indian country, but that definition itself refers to Indian country within the state of Alaska. And so, again, numerous provisions of the PACT Act show that Congress was meaning to adhere to the common sense understanding, as the state of New York stated, that Indian country is part of the state in which it is located, just as New York City is part of New York. And a sale from an Indian reservation in one state across the country to a different Indian reservation in a different state is plainly interstate commerce, both under a common sense understanding of that term and as is used in the PACT Act. I'd also just like to back up and say that Congress was... enacted the PACT Act under the background understanding of numerous Supreme Court cases that recognize that Indian jurisdiction is located within the state for purposes of cigarette sales. If that were so, wouldn't you assume that the statute would not have its own pocket definition of interstate commerce and would just assume that when you say interstate commerce, it means what everybody else means by that? Well, Your Honor, I think maybe that's a fair reading of the first prong, but as the state of New York stated, Congress went further in the second and third prongs and included transactions between a state and Indian country in that state. Which prong should we be looking at for this case? For this case, Your Honor, it's the first prong, between a state and a place outside the state. Again, that kind of captures the common-sense understanding of interstate commerce, which here we have a transaction between an Indian reservation in Washington and across the country to a different state, an Indian reservation in New York. And to the extent that Congress went further... Why wouldn't the Indian nation be a place outside the state if it's separately defined as something other than the state? Well, again, Your Honor, the definition of Indian country itself recognizes that it can be within a state and we have the Nevada v. Hicks understanding that that's the ordinary meaning is Indian country is in a state. Congress can also define two terms separately, but those terms can nonetheless have overlapping meaning. Again, as the state of New York alluded to, the definition of state also doesn't specify that localities are included, but New York City is included in New York and a sale from Seattle to New York City would be interstate commerce. Again, under just the common-sense meaning. What would be the ramifications for the United States or for the system of commerce in this country generally if we were to affirm what the district court ruled? Because I take it you're here for something other than collecting tax stamps for New York State. Well, Your Honor, if someone violates the PACT Act, if they don't file the necessary reports, the federal government can put them on the noncompliant list and that has significant consequences and one of the major tools for enforcing this statute, it can even prevent common carriers from carrying the tobacco products. And so if a reservation-to-reservation sale like this is not within the meaning of the PACT Act, then a company can ship truckloads of unstamped, unreported cigarettes into a reservation in a state, not file the necessary reports, the state can't track what's coming in, the Indian reservation, for that matter, can't track what's coming in, and the federal government wouldn't be allowed to put this company on the noncompliant list, which, again, is a major tool that ATF uses to enforce this statute. We're really talking about cigarettes? Yes, cigarettes, Your Honor. And to speak to the consequences here, again, it would create a substantial loophole in the Act. These sales could become commonplace. All you would have to do would sail to a reservation, to another reservation, and that opens the door for further downstream sales. And without the necessary reports being filed, again, the state's going to be hampered in its ability to track what's coming in. If the cigarettes are not stamped and they leave the reservation and go into a state that requires such a stamp, then someone's in possession of it already violating the state law. So it sounds like that loophole is not one that is not subject to sanction. Well, Your Honor, again, if truckloads of cigarettes are coming into New York, for example, New York can apply its own taxes to those laws, and certainly New York can tax certain sales on Indian reservations. Again, that's the Colville case. It just reaffirms again that Indian territory is in the jurisdiction of the state for these purposes. The state has an interest in tracking the cigarettes that are coming into its territory, and if this sale is not included, that deprives the state of that benefit, and again, the federal government wouldn't be able to put noncompliant sellers on the noncompliant list, which is a primary tool that ATF uses to enforce the statute. And if one is on the noncompliant list, what happens to one? Again, common carriers wouldn't be able to transport the product, is my understanding, Your Honor. Cigarettes or anything? Cigarettes, I believe. So it's a primary tool, because otherwise, states might have to bring piecemeal legislation to enforce the statute, whereas the noncompliant list, again, is a way that you put a seller on there, and it has a host of consequences that are meaningful. The ATF, in a separate matter, Your Honor, put King Mountain on, or threatened to put King Mountain on the noncompliant list for sales into Indian reservations in California, and soon thereafter, King Mountain started filing the necessary reports. So again, ATF has stressed that this, the district court's interpretation here would severely undermine federal enforcement of the PACT Act, and again, Congress enacted the PACT Act to strengthen existing reporting requirements and to close loopholes, and Congress was particularly concerned with Indian reservation sales, because some sales on those Indian reservations are tax-exempt. So it would make little sense for Congress to open a loophole precisely where they were concerned with legislating and closing loopholes. Thank you. Thank you. Thank you. In rebuttal, first, I wanted to correct what I'm sure was an inadvertent mistake about the record when the state was arguing. This December 3, 2012 truck stop, the truck driver question, that was a truck and a driver employed by a company named ERW, an Indian-owned company in New York, and one of King Mountain's customers. So the truck contained King Mountain cigarettes, but they were certainly no longer in the possession of King Mountain and were not owned by King Mountain. The driver was pulled over at a routine truck stop and discovered in the back of the truck were the cigarettes he was... He had invoices in his possession showing he was transporting the cigarettes from the Oneida Reservation to the Ghana Yank Reservation. And so it was more than 10,000 cigarettes. They were ERW cigarettes. The fellow was the driver. They weren't King Mountain cigarettes. They weren't being delivered for King Mountain. On the issue of res judicata, the complaint, if you look at paragraph 87, really only speaks to the past tense. It's the cause of action is for what had occurred, and those were November and December. And there is no request for an injunction in the wherefore clause or no language there that I see that would cover an injunction requiring that the only point of sale be to a stamping agent. No question that there were subsequent transactions. In fact, I think it evidences what I said at the start. I mean, King Mountain did not try to hide anything. It produced its records. It produced all evidence of its sales. And with respect to something else I said at the start, I would encourage the Court to look at the record... Sure. The wherefore clause seeks to stop your client from continuing to violate any of the statutes that are referenced in the complaint. Now, how would the Court do that? Well, I think once... Usually it would be by an injunction, right? Their claim for 471, which is what the injunction emanates from, was solely to collect taxes for King Mountain's possession. So if they succeeded on that claim, there would have been a hearing, the formula would have been applied, and a judgment would have been entered to collect the taxes. But the continuing violation would not necessarily be continuing not to pay the taxes that's owed. It would be continuing to ship cigarettes in a way that permits their sale within the state of New York when they are not stamped. If that's what they alleged and that's what they were seeking, that would be an appropriate injunction. But that's not the way they approached the case. What I think the truck stop also evidences, and we didn't touch on the Dormant Commerce Clause this morning, but I mentioned how King Mountain has, in effect, been singled out. If you look at page 770 of the record, this is a typical still shot of one of the videotapes that were taken at one of these undercover buys where the state investigator went into the Puspatak Reservation and bought two packs of cigarettes. And the counter is filled with New York-manufactured cigarettes by Indian tribes. And nothing's seized, nothing's investigated. There's one instance where a truck, a van, is actually being unloaded at one of these shops with New York-manufactured tribal cigarettes, and you see in the video the two investigators just chit-chatting while these people are unloading the truck. Well, I mean, the fact that the investigators lack initiative doesn't say anything one way or the other about the nature of the law. I think the state admitted in its papers that they were instructed to only buy King Mountain. But my point is that this concern for everything horrible that could happen and that King Mountain is a trafficker, I think it's belied by the record and the way the case has been approached. That's all I have, Your Honor, unless you have further questions. Thank you. We'll hear Sarah Butler again. Thank you, Your Honor. I'll just focus on the sort of consequences, the questions about the consequences of interpreting interstate commerce here. I mean, this is indeed a massive loophole as the U.S. said, and it's the exact kind of loophole that Congress was trying to stop. It's true that the state has some other state law or other mechanisms to try and enforce its tax laws, but the state has been trying to enforce its tax laws in many different ways, and it doesn't always work. And that's why the state tax law was amended to be the way it is now, and that is why we have federal statutes like the PACT Act and the CCTA that are meant to provide further mechanisms for the state to be able to enforce its tax laws and do more precisely because the prior systems weren't working fully. And this kind of so-called nation-to-nation sale, and King Mountain is not a nation, but reservation-to-reservation sale was precisely the type of shipments that Congress was trying to make sure did not evade state tax laws and other state public health laws as well through the PACT Act. And it went so far as to make interstate commerce not just crossing state lines and going reservation-to-reservation, but also shipments that go within New York but are moving from reservation to New York precisely because the tax evasion problem at issue was often emanating from reservation sales, which makes sense because it's the very narrow tax exemption for individuals on buying for their own use that can create the opportunity for this massive tax evasion. From the point of view of the state, what difference does it make in terms of relief whether the PACT Act does or does not allow or prevent this kind of doing? It makes a huge difference, Your Honor, because if the PACT Act applies, there are many PACT Act reporting obligations that would apply to King Mountain and that the district court could issue an injunction requiring King Mountain to comply with. And those reports are designed to provide a way for the state to track precisely these types of shipments to know what is coming in and out of reservations on its land in order to know whether the taxes that need to be paid by all those consumers who don't have any tax exemption are being paid or not. And it also, the noncompliant list, as the U.S. mentioned, is a huge tool that both the states and the federal government can use. But the states can only put somebody on the... or request to put somebody on the noncompliant list if they're violating the PACT Act. So if all of these millions and millions of cigarettes that are coming in unstamped suddenly comply with the PACT Act, New York can't use those as a basis to put King Mountain on the noncompliant list. And being on the noncompliant list is a big deal. It means that shippers like FedEx and UPS and other shippers are not allowed to ship cigarettes for those companies. And there are also separate penalty provisions that the PACT Act has that the state would be able to pursue if those claims came back into the case. Those were out of the case by the time we got to the relief stage. To help me understand how this scheme works, is it violative of New York law for cigarettes to be manufactured on an Indian reservation and sold on an Indian reservation to a non-Indian who comes in and buys a few packs and then leaves and smokes them? Yes. I mean, a non-Indian or a non-member of the tribe has absolutely no entitlement to any exemption from state tax. And so if they are buying cigarettes, they have to pay the tax. It doesn't matter... That's to say if the smoker then has to pay the tax. Correct. That's correct. But the way that the New York pre-collection system works is that all cigarettes that are sold need to have the stamps, even though the tax eventually, the incidence of the tax is supposed to eventually fall on the consumer. It was the case that trying to enforce the law only against every individual consumer who might go onto a reservation was impossible. You can't enforce it on the consumer who is an Indian living on the reservation. Oh, sorry. I thought you said a non-Indian. No. That's correct. Okay. But then if a non-Indian goes to the reservation and buys a carton of cigarettes, that person then is required to remit some of money to the state? In theory, yeah. I mean, that person is supposed to be paying... It's not going to happen, but... That person is supposed to be paying the tax. I mean, the price of their cigarettes is supposed to include the price of the tax. But that would usually be collected by the stamp. Correct. Which isn't there. Correct. I mean... It doesn't have to be there. No, it does have to be there. I mean, let me just back up. You have a shop that's selling cigarettes, and 99% of the people who come in are Indians. They don't have stamps on the cigarettes, and the Indians who live on the reservation do not have to pay the tax. Let me back up then, because I think... Let me back up. I think there is a misunderstanding in the way the system works. Go ahead. The way New York system works, and this is clear from 471 and 471E, all cigarettes sold on a reservation to anyone, Indian or non-Indian, do need to have a stamp. They all need to have stamps. But the state has different mechanisms to make sure that Indians on their own land who are buying for their own use, that the incidence of the tax doesn't actually fall on them. And that's the coupon system and the preapproval system. So the cigarettes that they buy, the cigarettes that an Indian member buys for their own use, do need to have stamps. But they don't have to pay the tax, because they come with... Let's say they have the coupon system in their nation. They come with a coupon. They hand that to the seller, and the seller doesn't include the tax in the price. Instead, the seller gives a piece of the coupon back to DTF, who gives them back the money. Sounds like I've opened a can of worms. It sounds complicated, but I think the bottom line is... After all that is over, has anybody paid the tax on those cigarettes? Hopefully, yes. Who? The tax, it's pre-collected by... The way it's supposed to work is that it's pre-collected by the agent. So it's pre-paid by the agent. But then the price of the cigarettes, as it goes down the line... The agent is the one who... The stamping agent, a licensed stamping agent. The licensed stamping agent is supposed to pre-pay the tax, so DTF gets the money. And then the price of the tax is included all down the line of the distribution chain until somebody walks into a store and buys one pack of cigarettes, and the price includes the tax. So now they have paid it, and the money has gone back into the system. Hopefully that clears it up. But I think the bottom line is that it is hard to enforce this against every consumer. That ends the discussion. Thank you. Clears it up with another matter. Thank you all. We will reserve decision.